## LEE, Guardian, Plaintiff-Appellee v STEPHENS, Defendant-Appellant.

Ohio Appeals, 2nd District, Preble County.

No. 107. Decided July 31, 1942.

432

John V. Dye, Eaton and John F. Ernst, Eaton, for plaintiff-appellee.

L. E. Kerlin, Greenville, and Robert E. Riegel, Greenville, for defendant-appellant.

## OPINION

By GEIGER, P. J.

This matter is before this court on an appeal from a decree and judgment of the Court of Common Pleas on questions of law and fact.

The petition recites that the plaintiff is the duly appointed guardian of Erma Lee Gruver, an insane person; that prior to June 17, 1940, the ward was the owner of the described real estate consisting of two separate tracts, one located in Preble county and one located in Darke county; that her husband William E. Gruver was the owner in fee simple of five separate tracts all presumably located in Preble county, although the description does not definitely establish the county except as to one tract.

It is alleged that the ward, prior to June 17, 1940, was the owner of the inchoate right of dower in the five tracts owned by her husband.

The petition alleges that on that day the ward, together with her husband, executed and delivered to the defendant, Morris Stephens, two deeds of general warranty, one describing the Darke county land and the other that located in Preble county; that at the time the deeds were executed the ward was of unsound mind and did not possess sufficient mental capacity to comprehend the nature and effect of her acts and it is alleged that the deeds so described, purporting to convey the land to Morris Stephens, ought to be set aside.

The prayer of the petition is that the deeds be held to be null and void and set aside and for other relief.

A demurrer was filed to the petition on the ground that there was a non-joinder of proper parties and because the court has no jurisdiction, the ground for the latter being that part of the land was located in Darke county and not connected with or adjacent to the real estate located in Preble county. The demurrer was overruled.

Morris Stephens for his answer denies in part that C. B. Lee is the duly appointed guardian.

For a second defense, Stephens alleges that Erma Lee Gruver and her husband, William E. Gruver, filed actions, one in Darke county and one in Preble county, praying that the deeds may be declared null and void; that on the 26th of July, 1940, the two cases were adjusted and settled in pursuance of which settlement the defendant paid to the plaintiff, Erma Lee Gruver, a large sum of money and executed to her a warranty deed for the land in Preble county; that by entry and order of the Common Pleas Court of Preble county and of Darke county, each of the cases was dismissed with prejudice to a new action and that by reason thereof all the matters now sought to be litgated are res judicata and that by virtue of the settlement there was an accord and full satisfaction.

As a third defense Stephens alleges that the plaintiff is not in this court with clean hands for the reason that the transfer of said real estate by her and her husband was a fraudulent transfer for the sole purpose of defrauding creditors of the parties.

As a sixth defense defendant denies that the plaintiff's ward was of unsound mind at the time of the making of the deeds, but alleges that she was at said time of sound mind and asserts that said transaction was made at her request and never induced by the defendant; that said transaction of June 17, 1940, was made for the purpose of defrauding creditors and that the same was in further-ance of a long line of similar transactions engaged in by her for years past. The prayer is that the petition may be dismissed.

On October 17, 1941, the court below rendered judgment upon the issues and the evidence. The court finds as to the ownership of the property on June 17, 1940, that at the time of the attempted conveyance of that date, Erma Lee Gruver was of unsound mind and without sufficient mental capacity to understand the nature of the transaction. It was by the court decreed that the deed of the hus-band and wife to Morris Stephens, purporting to convey the real estate situate in Darke county was null and void. It it further ordered that the deed to Morris Stephens for the land located in Preble county should be cancelled so far as it conveys the 44.50 acres in Preble county and that the said Erma Lee Gruver is the sole owner of these two tracts.

It is further ordered that the conveyance of the real estate solely owned by William on June 17, 1940, to Morris Stephens is not to be disturbed by the decree save so far as it attempted to convey the dower rights of Erma Lee Gruver, which conveyance the court holds should be set aside.

A motion for new trial was filed and overruled and notice of appeal given on questions of law and fact from the judgment and decree of the court under date of the 6th day of October, 1941.

Defendant-appellant assigns a large number of errors without numerical designation, which we may identify as follows:

(1) Newly discovered evidence which could not be produced at the time of the trial.

(2) For error of law occurring at the trial.

(3) Error in admitting evidence.

(4) Error in rejecting evidence.

(5) No evidence to sustain verdict.

(6) Same is contrary to the weight of the evidence.

(7) Other errors.

We briefly state that the controversy between the parties is based upon the deeds made to the defendant Stephens on June 17, 1940, of certain real estate, some located in Darke county and some in Preble county.

The evidence in the case is embodied in the bill of exceptions and certain other evidence taken during the trial in this court, all

of which is agreed to be the evidence upon which this case is submitted.

Counsel for defendant-appellant has stated his conclusion as to the evidence submitted in this case in blunt phrases, all highly uncomplimentary to the ward, Erma Lee Gruver.

The consideration of this case logically presents certain factual matters each of which may be determinative of the case.

First, had the ward, on June 17, 1940, sufficient mental capacity to comprehend the nature and effect of the making of the deed?

Second, if she had such capacity, was her purpose in making such deed to hinder and delay her Florida creditors so that she might not secure in this court any relief from her fraudulent act?

Third, if she had the mental capacity to make the deed and irrespective of whether it was made for the purpose of defrauding creditors, was the settlement of the two cases without prejudice a final determination of the controversy so as to render the same res judicata?

If the court determines that on June 17, 1940, this ward had not mental capacity to make the deed and as a consequence the same should be set aside, the same incapacity as of that date would to the same extent, be equally a defense against the claim that she is now in court with clean hands or that she had made an effective settlement of the controversy.

If she had not mental capacity to make the deed, she lacked mental capacity to determine to defraud her creditors and would likewise lack mental capacity to compromise the cause of action.

It will thus be seen that the primary problem is to determine whether or not, on June 17, 1940, she had mental capacity to make the deed. This question is a difficult one to determine.

The argument is advanced that an adjudication of insanity is conclusive of the person's incapacity to make ordinary contracts subsequent to the adjudication. In this case the deed in question was executed on the 17th day of June, 1940, and about a month later proceedings were had before the Probate Court of Preble county which resulted in the declaration that Erma Lee Gruver was insane at the time of the inquest and she was ordered incarcerated in the insane asylum. Due to the nature of her disease, as testified to by Dr. Hooper, it may be safe to assume that if she was insane in July, at the time of the inquest, she was likewise insane on the 17th day of June, the day of making the deed, and as more recently related in time, at the time when she entered into a contract with Stephens for the settlement of the suits. Actions to commit a person for alleged insanity are actions in rem and not inter partes.

The action in this case was brought by the guardian to set aside the conveyance on the ground of insanity of the grantor, which was alleged in the petition. The defendant in his answer alleges that the grantor was not insane at the time of the making of the deeds

and also inferentially he alleges that she was not insane at the time she made the contract with him for the return to her of her property and the payment to her of the sum of $1,000.00.

The question thus before us is whether or not in a case such as that at bar the finding of the Probate Court, that the party is insane at or about the time of the action complained of and the appointment of a guardian is conclusive of the person's incapacity to make ordinary contracts subsequent to the adjudication, or in this case, shortly before the adjudication.

The law in Ohio is not well defined. We find a discussion of the matter such as before us in 22 O. Jur., page 100, et seq. From this authority we summarize the following principles without assuming to quote accurately.

If it is proved that at a given time one was mentally incapacitated the **presumption** arises that he continues to be so thereafter and this must be rebutted or counterbalanced by competent proof. The presumption of a continuance of insanity is a rebuttable one and removed on sufficient evidence.

At page 103. An adjudication of insanity is competent evidence. The question the court must decide is not whether the evidence is admissible, but what probative force shall be given to it; in other words whether such an adjudication is conclusive evidence of insanity or only **prima facie** evidence. The rule is that an adjudication of insanity made after a transaction is at most presumptive evidence of insanity at the time of the transaction. It is stated that the better reasoned Ohio cases hold that an adjudication of insanity and appointment of a guardian are conclusive evidence of the person's incapacity to make or ratify contracts or to do an act in derogation of his guardian's authority while the guardianship subsists. It will be noted that this inhibition is directed to the ratifying of contracts or the doing of an act in derogation of the guardian's authority while the gaurdianship exists.

It is stated that in the matter of a marriage contract, the making of a will or alleged criminal act, the Ohio courts, in accord with the prevailing view elsewhere. hold the evidence of the adjudication or of the guardianship to be only prima facie evidence of incapacity.

This whole matter may be further examined under the authorities cited in 7 A. L. R., 568, et seq.

We find a very interesting case, **Jordan v Dixon, 16 O. D. Rep., 147, et seq.** The opinion is by Taft, J., when judge of the Superior Court of Cincinnati, rendered in 1887. It is there held,

"1. The due appointment by the probate court of a guardian of a person as an idiot, imbecile or lunatic is conclusive evidence of such person's incapacity to make or to ratify contracts, or to do

any act in derogation of his guardian's authority pending the guardianship."

Due to the eminence of the judge delivering the opinion, it should be carefully read and given the highest consideration. It is said at the bottom of page 149,

"For the reasons given, it seems to me that the appointment of a guardian of an idiot, imbecile or lunatic must be conclusive evidence of the incapacity of the ward to contract or do any binding act in regard to his property **in conflict** with the authority reposed by the law in his guardian so long as the gaurdianship continues." (Emphasis ours.)

I think this opinion should be read with the point in view that the court holds that the appointment of a guardian of a lunatic must be conclusive evidence of incapacity of the ward to contract or do any act in conflict with the authority reposed by law in his guardian. It does not mean and does not say that the insanity and appointment of a guardian is conclusive evidence of the incapacity of the ward to contract or do any binding act in relation to his own property before the same came into the control of the guardian. Judge Taft says,

"Coming now to the authorities, there being none in Ohio on this point, I am met by the statement of every text book on evidence, that inquisitions in lunacy, to which such proceedings in the probate court are claimed to be analogous, are only prima facie evidence of the lunacy of the subject of the inquest."

The judge then makes analysis of numerous holdings and his final judgment is, as above stated.

In the case of **Wheeler v State, 34 Oh St, 394,** a criminal case, it was held that where the defense relied on his insanity, the finding of the court that he was insane is competent evidence to prove such insanity but is only **evidence** of that condition.

The most instructive case we find is that of **Kennedy v Walcutt, 118 Oh St, 142.** It relates to a will contest and involved the question touching the introduction of the record of inquest as to the sanity of the testator. Being a will case it, of course, does not involve the same mental capacity as that required to make a deed. The condition of the testator at the time of making the will determines his testamentary capacity and evidence of his mental and physical condition within a reasonable time before and after the making of the will is admissible as throwing a light upon his mental condition at the time of the execution of the will. In an action to contest a will on the ground of mental incapacity, an adjudication of insanity

of the testator and the establishment of a guardianship on the ground of insanity is admissible in evidence as bearing upon the testamentary capacity of the testator. So as to ability to make a deed.

Every person is presumed to be of sound mind, yet where a person has been declared insane and is under guardianship, the presumption of sanity is not only removed but the **presumption** of insanity arises. The presumption of continuance of such insanity is rebuttable and would be removed when sufficient evidence has been introduced to meet or overcome the presumption arising from the adjudication.

The opinion in this case is by Day, J., and we find much of interest. The court says that it is sufficient to say that it has reached the conclusion that in a **will contest** case, evidence of the appointment of a guardian or an adjudication of insanity is admissible to go to the jury under proper instruction as bearing upon the testamentary capacity of the testator at the time of the execution of the will. The fact that a testator had been adjudged insane and under guardianship at the time of the writing of the will does not of itself prevent him from making a valid will provided he had the measure of capacity required for that act, which is stated, "capacity to understand the nature of the business in which he was engaged", etc. The fact that the testator had been adjudged insane and the presumption of the continuance of such condition was a circumstance that the jury had a right to consider as bearing on the issue whether or not the testator had the mental capacity to make a will. We think this case should be more carefully examined than can be done in an opinion of this kind, but we arrive at the conclusion that it is authority for the proposition that at least in a will case the adjudication of insanity and the appointment of a guardian furnishes no more than a presumption of insanity at the time of the writing of the will and that such presumption may be balanced or overcome by the evidence touching the circumstances surrounding the case.

**In Re Remus, 119 Oh St, 168,** gives many sidelights upon the effect of an adjudication of insanity. It is there held the fact that the Probate Court had previously ordered the commitment of the inmate to the Lima State Hospital constitutes no bar to the subsequent application for a writ of habeas corpus where the sanity or insanity of the inmate may be determined by the court. Much is said in this opinion by Jones, J., in reference to the right of the court to release a prisoner confined in the hospital without the consent of the superintendent. In such a case the presumption of his insanity continues and to obtain his release. the burden of proving his sanity thereafter is upon the prisoner or inmate of the institution; but in the last analysis, it is the court, upon application to it, and not the superintendent who must apply the rule and quantum of evidence in order to establish the sanity of the inmate. The court states on page 174,

"It is established by an overwhelming authority in this country and elsewhere that a previous adjudication of an inmate's mental condition constitutes no bar to another and later application for release from custody by the way of habeas corpus upon claim and proof of sanity at the time of his later application."

We are of the opinion that in the case at bar the commitment to the insane asylum a month after the making of the deed at most furnishes a **presumption** of insanity which may be overcome by the requisite amount of evidence to the contrary.

Two doctors, one the Superintendent of the Dayton State Hospital and the other one of the examining physicians at the inquest for lunacy have testified on behalf of the guardian, plaintiff-appellee. Dr. E. L. Hooper, Superintendent of the Dayton State Hospital, testifies that she was received in the hospital on July 29, 1940, and that he has seen the patient since that time on an average of three times a week; that she has a form of mental trouble which is known as "dementia praecox, paranoid type"; that such mental trouble is slowly progressive and insidious in its outset. Its most prominent symptoms are delusions, frequently of a persecutory nature, grandiose exaggerations and always with hallucinations of the senses of hearing, seeing, etc. The Superintendent testifies that she now shows the existence of these hallucinations and delusions. From his observations and knowledge of the form of mental trouble which the patient exhibits, this physician states that on June 17, 1940, she did not have sufficient mental capacity to transact ordinary business and that such inability probably antedated considerably the date of June 17th.

The testimony of the other physician for the guardian is in harmony with that of Dr. Hooper.

On the other hand, it is testified to by a large number of lay witnesses that this woman was not only mentally capable but was exceedingly bright; that she was neat, clean and effective as a good housekeeper but that she did have a strong appetite for liquor and that whatever action might lead to the observation of a physician that she was insane arose solely from overindulgence in intoxicating liquor.

Probably of the lay witnesses the sheriff is the most important. He testifies, in effect, that on July 24, 1940, his attention was called to her presence in front of the court house in Eaton where she was making a loud and boisterous demonstration; that he detained her until an affidavit was filed by her husband charging that she was guilty of operating an automobile while intoxicated. The sheriff testifies that he had her under observation in the jail for a considerable period before a lunacy affidavit was filed and during this period she behaved much the same as when she was first arrested for intoxication. The sheriff also testifies that during a transaction

touching the settlement of the pending cases when she was represented by her attorney, and also was advised by her father, he (the sheriff) advised the attorneys and her father that she was not then fit to do business. long after the effects of liquor had passed.

Dr. H. H. McClelland, a witness called by appellant, testified in considerable detail as to his conclusions in reference to the mental condition of the ward on June 17th. This physician did not make a personal examination of the patient, but testified in answer to a long and apparently fairly stated hypothetical question and in addition to such hypothetical question from his reading of the bill of exceptions and especially of the testimony of Dr. Hooper. We may state in the beginning of this examination, Dr. McClelland is frankly not friendly to Dr. Hooper. On being inquired as to whether he and Dr. Hooper were friendly Dr. McClelland stated, "Oh. I am afraid that there is anything else but friendliness". He was not permitted to explain. After being interrogated through the hypothetical question, he stated in his opinion she was not suffering from dementia praecox, paranoid type, and was capable of understanding any and all transactions that she might have entered into on June 17, 1940. On cross-examination he stated that even though the hypothetical question might not be accurate as to the statement of facts, such would not affect his conclusion stating, "My opinion, of course, is given not only upon the content of the hypothetical question but more particularly upon the evidence in the bill of exceptions by Dr. Hooper. the Superintendent of the Dayton State Hospital, which causes me to answer your question as ˮ did".

He testifies that in consideration of alleged insanity there are two fundamental factors concerned (1) Those in the sane state invariably follow out the first law of nature which is that of self-preservation and that when the patient shows evidence of lack of application of that law the examiner begins to consider them in the insane state. The second relates to the presence of delusions or hallucinations. He testifies that he failed to find any evidence that Irma Lee Gruver at any time went against the first law of nature of self-preservation so far as her business dealings were concerned. He states that Dr. Hooper's examination discloses the fact that the patient had complete insight or understanding of her mental sickness, which is contrary to the usual action of such patients. He testified quite positively that in his judgment the patient was malingering and analyses the action of a person who might desire to be considered insane. He concludes with the statement that the malingerer as a rule is carrying out the first law of self-preservation, the idea to carry out his own ego; he knows what he is doing; he has complete insight into his condition.

We are frank to say that the testimony of this witness, in which he concludes that the ward was not without mental capacity, is impressive and seems to fit in with the facts of the case.

There is no doubt that she has had, for the whole course of her life, a decided ability for self-preservation so far as it related to her financial condition. Shortly after her marriage to her present husband, she secured from him a deed for 80 acres in Darke county and from some evidence disclosed, also secured from him several thousand dollars in cash. She expressed regret that she had not secured a deed for all his real estate in both counties when she secured the deed to the 80 acres. As to the transaction leading up to the settlement of the two suits brought by her and her husband to set aside the deeds of June 17th, she displayed a keen bargaining instinct, insisting that she should retain the 80 acres that her husband had deeded to her and complained that if she only secured a reconveyance of the 45 acres in Preble county she would have gained nothing. It was only when her attorneys persuaded her that if she made the deed to Stephens for the purpose of defrauding creditors that she could not hope to recover under the law, that she finally consented to accept a reconveyance of the 45 acres originally belonging to her and a final payment to her of $1000.00 in cash. She also successfully negotiated for an automobile in addition to the cash payment. In her negotiations with the attorneys in reference to fees, she secured a reduction of the fee to be charged her from $500 to $250. On that settlement, $2000 was paid to the attorneys who still seem to have it in their possession. They state that $1000 of this was their fee from the husband for securing the settlement and that $250 was the fee to be paid by the ward for their services to her. They state that the reason they have not paid the money to the guardian of the ward was that the guardian has refused to accept it.

As a motive for her present malingering, if such be her action, we can readily understand that she knows that as long as she can remain an insane patient, her husband, who is now 74 years of age, will not be able to secure a divorce for which he has filed a petition and that if he predeceases her she would have certain interests in the several hundred acres that he has, unless his nephew, Morris Stephens, has succeeded in securing for himself the fee to this real estate leaving the old man with nothing but a life estate. What the future complications may be in reference to the interest of the ward in her husband's real estate, if he predeceases her, they are not sufficient to remove, in our judgment, the motive for malingering. She has quite an easy time at the State Hospital having frequent releases for visitations covering many consecutive days.

Charles Walter, a witness called on behalf of the defendant, testified to an occasion when Morris Stephens, a Mr. Williams and Mr. and Mrs. Gruver visited at Celina near Decoration Day. During the day the ward consumed large quantities of beer and evidently secured some hard liquor which loosened her tongue in a boastful assertion as to what she had been able to do with her husband, stating that she had just taken him for 80 acres. She was not then

particularly interested in him, but was after Morris Stephens and boasted that he was the next one on her list and that she would get him next; that she would be able to get his money if she could get him to stay with her just one night. She boasted about her other conquests of old men both matrimonial and financial.

Counsel for the plaintiff point to the fact that she displayed, on numerous occasions, evidence of delusions of grandeur in that she told of her many conquests of old men and the securing of money from them and that she thought the $1000.00 to be paid to her was not sufficient to enable her to put on a proper "front" in her contemplated conquests of other old men, one in particular living in California, and other boastful comments as to her ability to continue a long course of successful campaigns resulting in her financial betterment in her special brand of confidence game. As an illustration of her delusions of grandeur, Dr. Hooper testified that while he was passing through her ward, she engaged him in conversation stating she would like to be released from the hospital; that she could go out and make a lot of money. The doctor asked her if she thought she could make a lot of money and she answered, "Indeed I could". Upon being inquired how, she said "men". She said she liked that better than anything else she had ever done and stated she could make $200 a day in this way and that she had already made a lot of money with men. That was the theme of her talk. The doctor testified that she stated the easiest way to get it was to get the man in her room and get him drunk and keep him a week and that that was good for $500.

The trouble with the argument that this displayed delusions of grandeur is that the evidence shows, at least to some extent, she was telling the truth and reciting facts and was not indulging in delusions. She certainly had 45 acres of good Preble county land and within a short time after her marriage to her present husband secured a deed for 80 acres and upon the settlement made while she was in jail, she secured a cash payment of $750 after payment of her attorneys and a deed back to her of the original 45 acres.

William E. Gruver and his wife Irma Lee Gruver, under date of July 25, 1940, entered into a settlement of their respective property rights in the recited fact that Gruver was to obtain a divorce. The contract as accepted provided, (1) That he was to procure a deed from Morris Stephens to Irma Lee Gruver for the 45 acre tract formerly owned by her in Preble county. (2) That he would pay the sum of $1000 in cash to Irma Lee Gruver. (3) That she was to receive a Pontiac coupe. (4) The right of Irma to remove her property. (5) That Irma Lee Gruver dismiss with prejudice the two legal actions William and Irma have instituted against Morris

Stephens in Preble and Darke counties. That the conditions of this offer, in the event of divorce, shall be embodied in the decree of

divorce. This offer was accepted by Irma on the 25th day of July, 1940, her father acting as a witness.

In the settlement she insisted that she should have more money because she had to keep up a "front" and have a fine automobile and good clothes in order that she might enter prominent hotels for the purpose of meeting her paramours or prospective victims.

The trend of the testimony is such that the very brusk statement made by counsel for defendant is substantially sustained. The ward appears to be a shrewd, sharp, conniving female, who, over a long course of years, used her allurement to entrap old men for her personal aggrandizement.

We are of the opinion that her husband is the one who should have had a guardian as he was a very easy victim and, in his case, she acted with marked rapidity in acquiring his property. Rather than being an insane person not being able to transact business, she could be well classified as a modern Becky Sharp or a more modern prototype, Scarlett O'Hara. She may not have been as smart as either of these fictional characters, but she certainly was too smart for a number of profitable victims. She still has ambition but recognizes the fact that advancing years require a more attractive "front" than when she was younger and better looking.

Our conclusion is that the plaintiff guardian has failed in showing that she was without sufficient mental capacity to understand the nature of the transaction on June 17, 1940.

This brings us to the next factual matter to be determined and that is whether or not the deed was made to Stephens for the purpose of defrauding creditors. The testimony is not void of evidence that Stephens was the originator of the plan to deed the property to him. The Florida property cost $4500 upon which $400 was paid in cash. The Florida landowner seemed to have threatened to bring an action to collect the balance and Stephens, as much as anyone else, suggested the plan to transfer their property to someone else, he stating that at first he thought she would deed the property to her sister, but that suddenly without solicitation from himself, she arranged to deed not only her own property but that of her husband to Stephens with the understanding that he was to keep it until the Florida trouble blew over and then deed it back. The Florida case was settled by giving to the Florida grantors a deed for the property and they surrendering the outstanding notes, stating that they regarded the $400 cash payment as sufficient compensation. Immediately upon the notes being returned, Mrs. Gruver demanded from Stephens the reconveyance of the real estate. This he refused to do giving as his excuse that William Gruver insisted the deeds be made to him rather than to his wife, the husband at that time

apparently having had his eyes opened as to the character of the woman with whom he was enmeshed. If the deed was made for the purpose of defrauding the Florida creditors, then the law seems to be well established that equity will not relieve either party from the situation that has arisen by the wrongful act in endeavoring to defraud creditors. It occurs to us that it is rather unsportsmanlike in Stephens to endeavor to retain possession of the property when he himself was a party to the transaction and had full knowledge of the purpose for which the deed was given and admits he paid nothing for the property and does not deny that he had promised to reconvey it.

While evidence is introduced to the effect that the woman had repeatedly stated that the transfer was made for the purpose of defrauding the Florida creditors, yet we are not so certain that the circumstances would condemn it as a fraudulent transaction as to make it a basis for the refusal to intervene as a court of equity, if justice requires that procedure.

There are many interesting cases touching upon the rights before a court of equity of those who have participated in a fraudulent transaction. Among the cases cited are:

Trimball v Doty, 16 Oh St, 119.

Robinson v Robinson, 17 Oh St, 480.

McQuade v Rosencrans, 36 Oh St, 442.

Pride v Andrews, 51 Oh St, 405.

Collins v Miller, 52 Oh St, 677.

Kihlken v Kihlken, 59 Oh St, 106.

Wright v Snell, 22 O. C. C., 86.

Of course, if the ward was, at the time the deed was made, without mental capacity to make the deed, then by the same token she was without mental capacity to form the intent to defraud creditors.

However, we are of the opinion that irrespective of the purpose of the making of the deed, we must consider whether or not the settlement made does not effectively bar this action. This, of course, would be on the basis that the ward had sufficient mental capacity, not only to make the deed but to enter into the contract of settlement. This attracts our attention to the two cases, one in Preble county and one in Darke county, brought by William E. Gruver and Irma Lee Gruver, plaintiffs v Morris Stephens, which are substantially the same but filed in the two courts because of the location of the real estate.

Case No. 14550 filed in Preble county alleges that the Gruvers are husband and wife and that on the 17th of June, 1940, they were the owners of seven tracts in Preble county of the market value of $20,000.00; that Morris Stephens was the nephew of William E. Gruver, the parties all living together in a confidential family re-

lationship. It is asserted on the 17th of June, 1940, the defendant, Morris Stephens, by means of false and fraudulent representations and promises prevailed upon the plaintiffs and induced them to execute a warranty deed conveying the real estate to him; that there was no consideration for said deed; that the representations made were false and known to the defendant to be false; that Gruver is an aged man and that his wife, Irma, has no business experience and that both were under the complete domination and control of the defendant and were prevented from obtaining proper advice and that the conveyance was made in reliance upon his false representations. The plaintiffs pray that the court find and declare the deed to be a nullity and of no legal effect and that the same be rescinded. In this case Irma Lee Gruver, the present ward, moved that the action be dismissed with prejudice and represented to the court that the matters in controversy had been fully adjusted and settled and it was ordered that the action be and the same was dismissed with prejudice. Said entry was filed on July 26, 1940. We find no entry in this case dismissing the action on behalf of William E. Gruver. At about the same time William E. Gruver filed a petition for divorce.

In the case in Darke county like allegations were made in reference to the one piece of land in that county. In this case there appears an entry of July 27th to the effect that William E. Gruver desired to dismiss the cause and it was ordered by the court that said cause be dismissed as to William E. Gruver with prejudice to the bringing of another action by him and the name of William E. Gruver is stricken from the records as a party. This action related to the 80 acres which were conveyed by William to his wife on May 23, 1940 and afterwards on July 17, 1940 conveyed by both husband and wife to Morris Stephens. On the same day, July 27th, 1940, there is an entry in which it appears that on motion of Irma Lee Gruver the court ordered that the action be dismissed with prejudice she representing that the matters in controversy had been fully compromised and settled.

Having heretofore found that the ward was of sufficient mental capacity to make this contract, we arrive at the conclusion that these two cases are effective to dispose finally of the action of the plaintiff guardian for the recovery of the real estate. If the cases set up fully, as they do, the ground for recovery of the property from Stephens and were settled, that finished the matter. We are informed from some slight reference thereto that Stephens and William E. Gruver settled their controversy by Stephens deeding to Gruver a **life estate** in the property, Stephens retaining the fee.

How stands the matter now after the tangled web of deception is cleared up? First as to Irma Lee Gruver, she has restored

to her the real estate which she owned in Preble county subject, no doubt, to the dower interest of her husband, who probably will not survive her and she has in hands of her attorneys $750 together with whatever dower rights she may have in her husband's real estate.

As to Stephens, the nephew, he seems to have secured the fee simple of his uncle's land subject to his life estate in the various pieces of property he owned, so that his profit from the transaction was considerable. He claims to have paid out $3,000.00, $1,000.00 going to the attorneys of Mr. Gruver and $1,000.00 to Irma Lee Gruver and the other $1,000.00 incidental expenses and losses which he incurred.

How does the matter stand with William E. Gruver? He is an old man with a young designing wife who is confined in the insane asylum; probably a malingerer. He has lost to his nephew, who has assumed a virtue which he does not appear to have, the fee title to all his good acreage in Darke and Preble counties. He has paid to his wife some three or four thousand dollars in cash. As we have before stated, if anybody should have had a guardian it was the husband who was foolish enough to believe that a very much younger woman married him for love and affection rather than to "roll him" for his property.

The order of the court will be to the effect that the petition be dismissed. This will leave the parties in the position in which they have placed themselves.

BARNES, J., concurs.
HORNBECK, J., concurs in judgment.

### APPLICATION FOR REHEARING

No. 170.   Decided March 8, 1943.

BY THE COURT:
This matter come before us upon a motion of C. B. Lee, guardian, that the court reconsider its decision of July 31, 1942, for the reason that the same is not supported by the evidence and it is contrary to the law as applied to the facts in the instant case.

This application is supported by an extensive memorandum and is resisted by a reply memorandum by defendant-appellant.

The decision in this case was rendered July 31, 1942, and shortly thereafter the application for a rehearing was made.

The court has purposely delayed deciding this application with the thought that passage of time may assist in the proper determination of facts in this case. It will be recalled that the action

was based upon the petition of the guardian seeking to set aside deeds made by his ward on the ground that at the time she made the deeds she was mentally incompetent, and this court then held that she had mental capacity not only to make the deeds, but to enter into the agreement to dismiss the several causes of action which were pending affecting the several pieces of real estate. The deeds were made on June 17, 1940. It will be recalled that one expert witness, Dr. Hooper, Superintendent of the Dayton State Hospital testified that she was suffering from what is known as dementia praecox paranoid type; that said mental trouble is slowly progressive and that judging from her condition when he examined her. she did not, on June 17, 1940, have sufficient mental capacity to transact ordinary business, and that such inability probably antedated considerably June 17th.

Dr. H. H. McClelland, the witness called by the appellant, who had made no personal examination of the patient but testified in answer to a hypothetical question and from the evidence disclosed by the bill of exceptions, stated in his opinion the patient was not suffering from dementia praecox and was capable of understanding any and all transactions that she might have entered into on June 17th, 1940.

This court considered the evidence of these two experts as well as the evidence of lay witnesses, and concluded that on the date in question she was not incapacitated.

Such a time has now elapsed that there should be no difficulty in coming to a definite conclusion as to her mental condition on the day in question, or at least her present mental condition, which would throw light upon the question of what was then her mental condition.

This is an equity case, being tried before us on evidence de novo. We may, therefore, open the case upon our own motion for such additional evidence as in our judgment would be of value. We reopen the case inasmuch as no finding or judgment entry has been journalized. This only to the extent of permitting certain and definite testimony as to her present mental condition as the same may relate to her mental condition on the day in question. We will limit the number of witnesses on each side to two and would suggest that it might be more convenient for all parties to hear these witnesses in Dayton. as that is the county in which the patient is confined to the State Hospital.

Modified application allowed. and cause set for further hearing upon the points indicated before this court while sitting in Dayton.

BARNES, P. J., HORNBECK and GEIGER, JJ., concur.