[Cite as *In re Guardianship of Kindell*, 2022-Ohio-3456.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

| | | |
|---|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF KRISTA KINDELL | : : : : : : : : : : : : | Appellate Case No. 2022-CA-8<br><br>Trial Court Case No. 80434<br><br>(Appeal from Common Pleas Court – Probate Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of September, 2022.

. . . . . . . . . . .

CHRISTOPHER D. CLARK, Atty. Reg. No. 0065132, 425 North Main Street, Piqua, Ohio 45356
    Attorney for Appellant

JACK L. CARTER, Atty. Reg. No. 0004673, 405 Public Square SW, Suite 253, Troy, Ohio 45373
    Attorney for Appellee

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Appellant Krista Kindell ("Kindell") appeals from the Miami County Probate Court's judgment denying her request for permission to get married. According to Kindell, the probate court erred in finding that she lacks the mental capacity to enter into a marital contract. For the following reasons, we affirm the probate court's judgment.

I.    Facts and Course of Proceedings

{¶ 2} On August 15, 2005, Jack Carter, an attorney in Miami County, filed an application for appointment of a guardian of an alleged incompetent person, Kindell. Submitted with the application was a "Statement of Expert Evaluation" completed by Charlene Cassel, a Chief Psychologist at Harbor Behavioral Healthcare in Toledo. Dr. Cassel stated, in part, that "Krista Kindell is functioning in the range of mild mental retardation (full scale IQ of 64). She has additional mental health diagnoses of depression, PTSD and an explosive disorder which further impedes her ability to interact with others and take care of herself." She opined that Kindell could not conduct business affairs or properly care for herself without the aid of a guardian.

{¶ 3} An investigator's report completed by J. Sue Deaton was submitted to the probate court on September 9, 2005. The investigator stated that there was a necessity for guardianship because Kindell "is childlike in behavior – She knows basic knowledge of care – needs guidance and directions to carry out daily life skills." The investigator noted that Kindell was receiving assistance from Riverside and that she attended Safe Haven daily.

{¶ 4} On September 21, 2005, the probate court appointed Jack Carter as

guardian of Kindell's person indefinitely. Over the next several years, Carter filed updates with the probate court and submitted detailed fee requests for any work completed as guardian of Kindell.

{¶ 5} On November 6, 2013, Carter filed a motion to terminate the guardianship. The impetus for this motion was Kindell's repeated requests to get married to her boyfriend, Jason Tackett. According to Carter, he filed this motion in order for the probate court to determine whether, as guardian of Kindell's person, his approval was required before Kindell could get married and terminate the guardianship. Carter stated that he would not give permission for the marriage under the circumstances that then existed.

{¶ 6} On February 24, 2014, Kindell filed a list of 12 reasons why she did not need a guardian. Included in the list were "my boyfriend thinks I am ready to be on my own" and "I want to get married. We exchanged vows at church on Christmas eve but we still want to get married."

{¶ 7} On February 26, 2014, the probate court denied the motion to terminate the guardianship. The court noted that "[e]vidence indicated that Krista loans or gives Jason money (never to be seen again) and that Krista borrows money for Jason from others and doesn't pay it back. This is unhealthy."

{¶ 8} On April 9, 2015, Carter, as guardian, filed a motion for protective orders that requested, among other relief, that Krista be restrained from "taking up residence with Tackett" and Tackett be ordered to immediately vacate Kindell's apartment. On November 2, 2015, an "Agreed Entry for Resolution of Motion for Protective Orders on an

Interim, Probationary Basis" was filed with the probate court. In short, the agreed entry allowed Kindell and Tackett to continue living together but placed several obligations on both of them.

{¶ 9} On April 19, 2016, Kindell sent a letter to the probate court asking for a guardianship review hearing so that she would have an opportunity to show that she no longer needed a guardian. Pursuant to Kindell's request, an evaluation for guardianship was conducted by Daniel D. Hrinko, a psychologist. Based on his interviews with Kindell, an advocate for Kindell, and Carter, along with his review of records, Hrinko stated, in part:

> [Kindell] has pursued relationships with individuals who provided little support and encouragement and who have contributed very little to their mutual benefit as a cooperative and collaborative relationship should. Those situations have resulted in her being evicted from four separate residences due to unclean conditions and to being exposed to unstable individuals due to their medical problems, substance abuse, and mental health problems. All indications suggest that these difficulties continue.
>
> * * *
>
> Throughout this interview, there were no indications of her having the ability to understand the consequences of her actions and to take this information into account when making decisions. It has been noted by several professionals that she continues to remain involved with individuals who are seen as disruptive and upsetting. Her psychiatrist has specifically

stated on numerous occasions that her fiancé should not attend medical appointments due to the disruptive nature of their relationship on her clinical presentation during appointments. However she persists in having him attend.

* * *

Although Krista has capabilities to function at a higher level than has been noted in the recent months, there are clear indications that her intellectual disability interferes with her ability to exercise these capabilities in a responsible manner leading to poor compliance with treatment, an increase in debilitating symptoms, and decisions that are dangerous to both herself and those around her.

There is sufficient evidence that Krista has difficulty exercising reasonable judgment that could put her at risk for significant problems with financial and other essential decisions. There is clear evidence that she is not capable of making use of her ability to make reasonable and appropriate medical decision regarding her health, welfare, and safety. Therefore, a guardianship should be continued.

Kindell subsequently withdrew her request for an independent evaluation and dismissal of guardianship.

**{¶ 10}** On June 7, 2021, Kindell filed two handwritten notes with the probate court. Although neither note mentioned marriage, the guardian and the court treated these notes as a motion by Kindell to marry Tackett and terminate her guardianship. On October 14,

2021, a hearing was held on the motion before a magistrate. Kindell, Tackett, Richard Naff, and Benjamin Battista testified at the hearing.

**{¶ 11}** Kindell testified that she had a mental disability but no physical disabilities. October 14, 2021 Hearing Transcript ("Tr."), p. 6. She received approximately $1,000 per month through SSDI and received food stamps. She used a payee to assist her in paying her monthly bills. *Id.*

**{¶ 12}** At the time of the hearing, Kindell was not employed and lived at Safe Haven with a roommate that she did not particularly like. *Id.* at 5-6, 39. She stayed several nights per week at Tackett's apartment rather than at her place. *Id.* at 9-10. Kindell had been dating Tackett since 2007. *Id.* at 11. She loved him and Tackett really cared about her. *Id.* at 13. They enjoyed doing the following together: hanging out, playing video games, watching football in person and on television, and going to a church where they were greeters and ushers. *Id.* at 12. Kindell stated the following when asked what was her understanding of marriage: "We be one thing until he dies and plus you can't cheat on somebody if you're married to that is against the bible and that is what I want to be with." *Id.* at 14. She also stated that they have to support each other in a marriage by being there for each other if one is sick and by putting their incomes together and working as a team. *Id.* Kindell admitted, however, that she had cheated on Tackett several times since they got engaged. But she stated that she was "going to change that." *Id.* at 28.

**{¶ 13}** Kindell and Tackett had been evicted several times for not keeping their apartments clean. *Id.* at 21-22. Kindell stated that they would clean better and stop this

eviction pattern if they got married. *Id.* at 24. She believed her cleaning habits had already changed for the better. *Id.* at 37-38.

{¶ 14} Kindell conceded that she and Tackett had difficulty managing money. *Id.* at 26. Both Kindell and Tackett had payees who helped them stay current on their bills. But Kindell blows the money left over after her payee pays the bills. *Id.* at 35-36. Further, Kindell was willing to give up her $112,000 housing waiver in order to get married, because she did not like her current roommate and did not feel safe at the house. *Id.* at 39.

{¶ 15} Kindell testified about past controlling behavior by Tackett. He used to listen to her phone calls and told her what not to say. *Id.* at 32. Also, she felt the need to ask his permission to speak at her own team meeting. *Id.* at 33.

{¶ 16} Kindell admitted that she hated her guardianship and would like for it to be over. She understood that if she got married, her guardianship would be dissolved. *Id.* at 34.

{¶ 17} Richard Naff, who attended the same church as Kindell and Tackett, testified on Kindell's behalf. He described himself as a care pastor at the Gingshamburg church. Naff stated that Kindell and Tackett wanted to get married because the Bible says that you should not live together when you are not married. *Id.* at 43. He believed that Kindell and Tackett complemented each other well and that Kindell had an understanding of what marriage is. *Id.* at 44, 47. Naff noted that Tackett is an alcoholic that previously attended the Next Step program offered by the church they attend. *Id.* at 49. But the Next Step program had been dissolved, and Tackett's drinking had not

improved since Covid started. *Id.* at 43, 49. According to Naff, Tackett and Kindell had been talking about marriage for almost two years. He believed this talk started when Kindell became more familiar with the Bible's teachings. *Id.* at 55.

**{¶ 18}** Jason Tackett testified that he was 53 years old and received $1,033 in monthly income. *Id.* at 58, 61. He used a payee in order to pay his bills and planned to keep a payee in the future. *Id.* at 59.

**{¶ 19}** When asked why he wanted to marry Kindell, Tackett replied "I love her with all my heart and I like helping her out and heling her [sic] help her try to make good decisions and I love her with all of my heart . . . and I think she can do it too." *Id.* at 62. According to Tackett, he wanted "to do the right thing being married instead of having an (inaudible) doing everything wrong in the bible. I want go ahead and get married and live the Jesus's way." *Id.* at 76.

**{¶ 20}** Tackett conceded that he drank when he was stressed and that he did not receive any counseling for his alcohol abuse at the time of the hearing. *Id.* at 70-71. He stated that he would quit drinking alcohol if he got married to Kindell. *Id.* at 71.

**{¶ 21}** Benjamin Battista, a Service and Support Administrator Manager at the Miami County Board of Developmental Disabilities, assisted Kindell by connecting her with services from a variety of sources, including setting her up with her housing. *Id.* at 77-78. He believed Kindell would suffer if she left her current living arrangement, especially in terms of self-direction and self-sufficiency. *Id.* at 81-82. Battista was concerned about Tackett's health and Kindell's ability to function without Tackett. *Id.* at 85.

{¶ 22} Kindell's living arrangement at the time of the hearing was at a brick, ranch-style residence that was staffed at all times. *Id.* at 80. Her previous living arrangement with Tackett in 2018 had had unsanitary conditions, and the landlord had refused to renew the lease with them. *Id.* at 85-88. Battista did not believe Kindell had the ability to function without a guardian looking out for her. According to Battista, Kindell would be homeless if not for his agency getting her the housing waiver. *Id.* at 102. He testified that she would lose the housing waiver if she left the program. *Id.* at 101-102.

{¶ 23} On October 26, 2021, the magistrate issued a decision denying Kindell's request for permission to marry Tackett. The magistrate initially noted that R.C. 2111.45 terminates the guardianship upon the marriage of the ward and that R.C. 2111.13 provides that the guardian's duties are to protect and control the person of the ward. Further, the magistrate stated that a ward cannot bind her guardianship estate to the obligations based upon contract, unless ratified by the guardian. October 26, 2021 Magistrate's Decision, p. 2, citing *In re Guardianship of Allen*, 50 Ohio St.3d 142, 552 N.E.2d 934 (1990). Therefore, the magistrate concluded:

> [I]t would seem that a marriage is a civil contract, in which, both partners must be able to consent to the contract and that someone under a guardianship does not have the capacity to consent. Therefore, someone under a guardianship cannot enter into a marriage contract. However, if we then apply the rational [sic] of the Court in *In re Allen*, a guardian could ratify or approve of the contract which would bind the estate of the guardianship. Thus, if the guardian approves, the ward could get married.

Magistrate's Decision, p. 2-3.

{¶ 24} Kindell filed objections to the magistrate's decision, and the guardian filed his response to the objections. On February 28, 2022, the probate court overruled the objections to the magistrate's decision. The probate court first noted that the issue before the court was whether Kindell had the mental capacity to appreciate what it meant to enter into a marital relationship with her fiancé, Tackett. After summarizing the testimony presented at the hearing, some of the court's prior rulings, and the guardian's arguments against allowing the marriage, the court concluded that Kindell had "failed to establish that she has the capacity and understanding to enter into a marriage contract."

{¶ 25} Kindell filed a timely notice of appeal from the probate court's decision.

II.    Kindell Did Not Suffer Any Prejudice From The Probate Court's Reference to Statements Made In The Guardian's Opposition Memorandum

{¶ 26} Kindell's first assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION BY CONSIDERING AND RELYING UPON INFORMATION NOT PROPERLY IN EVIDENCE IN SUPPORT OF ITS FINDING THAT PETITIONER-APPELLANT DID NOT HAVE THE MENTAL CAPACITY TO ENTER INTO A MARRIAGE CONTRACT.

{¶ 27} Kindell contends that the probate court improperly considered "as evidence the unsworn statements and personal opinions of Mr. Carter." Appellate Brief, p. 6. According to Kindell, "it is clear the Trial Court gave substantial weight to the said unsworn

statements and opinions of Mr. Carter in finding that Kindell lacked the mental capacity to marry." *Id.* In support of her position, Kindell points to the fact that the probate court noted in its judgment that Carter set forth a brief history of Kindell's poor decision-making in Carter's memorandum filed in opposition to Kindell's motion and then cited some of these examples of poor decision-making as support for its decision to deny Kindell's motion. As a result, Kindell argues, she suffered substantial prejudice.

**{¶ 28}** The two paragraphs in the probate court's decision to which Kindell takes exception are paragraphs three and four, which state:

> 3.    The guardian of Krista, Attorney Jack Carter, did not testify at the hearing, however, he filed a Memorandum Contra to petition of ward to marry on October 8, 2022. Mr. Carter was appointed guardian for Krista in 2005. Krista is now approximately 35. The guardian is concerned that if she were to marry that Krista might lose a substantial portion of aid. [Memo Contra page 2] Further, the guardian stated in his memo that "* * * Krista completely lacked the insight and emotional maturity necessary to enter into a marriage." [Memo Contra page 2] Finally, as far back as 2011 the guardian wanted Krista and her fiancé to complete some kind of basic course of pre-marital counseling with their pastor or local counselor. Finally, the guardian was and is concerned that Krista's fiancé is putting pressure on her to marry calling her names like "chicken-shit". [Memo Contra page 3]

> 4.    The guardian very succinctly and relevant to her ability to

understand the construct of a marriage contract set forth a brief history of Krista's poor decision making examples.   [Memo Contra page 6]   These examples include, but are not limited to Krista going to the emergency room hundreds of times, making false police report about being raped by an individual she was sexually active with to cover up the affair to her fiancée, and at times living in squalor to the point of being evicted.

February 28, 2022 Judgment, p. 2-3.

{¶ 29} We disagree with Kindell's contention that the probate court improperly relied on statements in Carter's memorandum rather than the testimony and other evidence of record.   There were many examples of Kindell's poor decision-making presented to the court through the testimony of Kindell and Battista.   Further, the record contained a number of previous filings that contained evaluations by psychologists describing Kindell's poor decision-making and decisions by the probate court noting examples of this poor decision-making.   Therefore, we cannot conclude that Kindell suffered prejudice solely from the probate court noting that these same examples of poor decision-making were set forth in Carter's memorandum in opposition to Kindell's motion.

{¶ 30} The first assignment of error is overruled.


III.    The Probate Court Did Not Err In Finding Kindell Lacked The Capacity And Understanding To Enter Into A Marriage Contract

{¶ 31} Kindell's second assignment of error states:

THE TRIAL COURT ERRED IN FINDING THAT PETITIONER-

APPELLANT LACKED THE MENTAL CAPACITY TO ENTER INTO A MARRIAGE CONTRACT AS SUCH FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 32} There is not much guidance in our statutes or our case law regarding whether a ward who has been adjudged incompetent should be permitted to enter into a marriage contract. R.C. 3103.01 does provide that "Husband and wife contract towards each other obligations of mutual respect, fidelity, and support." These mutual obligations form a foundation upon which the marriage contract is built. But the question arises whether a ward has the capacity to understand and consent to these obligations as part of a marriage contract. This question is even more vital when we consider that "[t]he marriage of a ward shall terminate the guardianship as to the person * * * of the ward." R.C. 2111.45.

{¶ 33} Generally, "[t]he appointment of a guardian is conclusive evidence that the ward is incompetent to enter into a binding contract or deed that touches upon the guardianship; however, as to matters that in no way conflict with the guardian's authority, the appointment of a guardian is only prima facie evidence of incompetency. Therefore, the fact that a guardian has been appointed on behalf of a ward does not necessarily preclude such ward from entering into a marriage." 53 Ohio Jurisprudence 3d, Guardian and Ward, Section 63, at 81 (2017), citing *Witt v. Ward*, 60 Ohio App.3d 21, 573 N.E.2d 201 (12th Dist.1989) and *Boyd v. Edwards*, 4 Ohio App.3d 142, 148, 446 N.E.2d 1151 (8th Dist.1982).

{¶ 34} In *Boyd*, the Eighth District explained:

In the context of marriage, an adjudication of incompetency prior to marriage is not necessarily conclusive proof of the person's incapacity to enter a valid marriage. According to *Seabold v. Seabold* (1948), 84 Ohio App. 83, 84 N.E.2d 521 [39 O.O. 112], a mentally ill person who has an appointed guardian can still enter into a valid marriage, provided he or she "fully comprehends the nature and consequences of his or her act in getting married." *Id.* at 88, 84 N.E.2d 521.

This court addressed the issue of an incompetent's ability to marry in *Dozer v. Dozer* (App.1930), 8 Ohio Law Abs. 507, where we said:

"While it is true that [the wife] Electa King Dozer was at the time of the marriage under a guardianship yet from the testimony and from the evidence she gave it is evident that she fully understood what she was doing and had sufficient mental capacity to enter into the marriage relation. The mere fact that she was under a guardianship would not render the marriage contract void. The degree of mental capacity required to enter into a valid marriage is laid down in 18 R.C.L. as follows:

" 'Therefore, it is not every unsoundness of mind that will make void a marriage contract, and if a person entering into the marriage relation has sufficient capacity to understand the nature of the contract and the duties and responsibilities which it creates the marriage will be valid.' " (Emphasis added.) *Id.* at 507.

*Boyd* at 148.

{¶ 35} In *Seabold v. Seabold*, 84 Ohio App. 83, 84 N.E.2d 52 (9th Dist.1948), Julie Seabold sought a declaration that her marriage contract between she and Edward Seabold constituted a valid and legally binding marriage despite the fact that Edward had been previously adjudicated an incompetent person and Edward's brother had been appointed as guardian of Edward's person and estate. *Id.* at 84. At the conclusion of the trial, the court found that the parties had entered into a valid marriage. *Id.* at 85. On appeal, the Ninth District noted the general rule that if either party lacks the capacity to consent, the marriage is ineffectual and void ab initio. *Id.* at 87-88. But the court continued, "If, however, a person who is mentally ill, fully comprehends the nature and consequences of his or her act in getting married, the marriage is valid." *Id.* at 88.

{¶ 36} Similarly, the Twelfth District has concluded that the fact that a person has been adjudged incompetent does not necessarily foreclose the person from getting married. In *Witt*, 60 Ohio App.3d 21, 23-24, 573 N.E.2d 201, the court stated:

> The appointment of a guardian is conclusive evidence of the ward's incapacity to do any act which conflicts with the authority given to the guardian. Therefore, there is a conclusive presumption that the ward is incompetent to enter into a binding contract or deed. *Fiorini v. Goss* (1921), 23 Ohio N.P. (N.S.) 303, *affirmed* (1923), 108 Ohio St. 115, 140 N.E. 324. However, the appointment of a guardian is only prima facie evidence of incompetency. Therefore, the guardianship is only prima facie evidence as to the ward's capacity to marry, make a will or commit a crime.

*Jordan v. Dickson* (1887), 10 Ohio Dec.Rep. 147, citing *Wheeler v. State* (1878), 34 Ohio St. 394. *See*, *also*, *Lee v. Stephens* (App.1942), 38 Ohio Law Abs. 431, 50 N.E.2d 622.

*Witt* at 23-24. *Compare In re The Guardianship of Houseman*, 4th Dist. Ross No. 831, 1981 WL 6048, *2 (Oct. 30, 1981) ("The guardian has the power and the duty to protect and control the ward. A person adjudged incompetent may generally not spend money, chose [sic] where to live, make contracts, or marry without the guardian's consent.").

{¶ 37} Kindell testified that she understood what marriage means. She explained that she could not cheat on her husband, they would combine their money, and they would support each other when one of them was sick. Both she and Tackett noted that they wanted to be consistent with the Bible's teachings. But Kindell also testified that she had cheated on Tackett since they were engaged. Further, she conceded that she did not manage money well and had a bad history with Tackett in regards to keeping their living quarters in sanitary condition. Kindell testified that things would change for the better on all these fronts if she got married to Tackett. That was a constant theme in the testimony of both Kindell and Tackett: their behavior would change for the better *after* they got married.

{¶ 38} The probate court reiterated some of the evidence of past, poor decision-making by Kindell in regard to her relationship with Tackett. The court also summarized some of its prior rulings in which it had highlighted Tackett's questionable treatment of Kindell and her willingness to let him treat her that way. The probate court then concluded that Kindell "failed to establish that she has the capacity and understanding to

enter into a marriage contract."

{¶ 39} It is clear that the probate court did not find credible Kindell's testimony that she understood the nature of the marriage contract and the duties and responsibilities that it creates. An appellate court gives deference to a trial court's credibility determinations, because the trial court is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). We defer to the probate court's credibility determinations. Further, the probate court's conclusion was supported by the evidence of record that over the past approximately ten years since Kindell first raised the issue of marriage with her guardian and the probate court, she had cheated several times on Tackett and continued to blow her money. These facts weighed against a finding that she understood the obligations of mutual respect, fidelity, and support. R.C. 3103.01. Therefore, we cannot conclude that the probate court erred in finding that Kindell lacked the necessary capacity and understanding to enter into a marriage contract.

{¶ 40} The probate court's decision precludes Kindell from getting married at this time. But Kindell will have an opportunity, through her future actions, to show that she truly understands the nature of the marriage contract and is capable of consenting to taking on the mutual obligations inherent in a marriage contact. Her actions to this point have not matched up with her words.

{¶ 41} The second assignment of error is overruled.

IV.     Conclusion

**{¶ 42}** Having overruled both of Kindell's assignments of error, the judgment of the probate court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Christopher D. Clark
Jack L. Carter
Hon. Scott Altenburger