BOYD, GDN. OF ESTATE OF EDWARDS, INCOMPETENT, APPELLEE, *v.* EDWARDS, APPELLANT.

(No. 43954 — Decided June 3, 1982.)

*Mr. George Lowy,* for appellee Annie Boyd, guardian.

*Ms. Deborah Purcell Goshien,* for appellant Essie A. Edwards.

PRYATEL, C.J. Defendant-appellant, Essie A. Edwards, appeals from the granting of a divorce to her husband Charles H. Edwards, an incompetent, whose case was filed by his guardian, Annie Boyd.

The complaint in this action was filed on September 4, 1980, by the husband's sister and guardian Annie Boyd, alleging that she is the guardian of the person and estate of her brother Charles H. Edwards; that Charles and Essie Edwards were married in 1966, and that no children were born of that marriage;[1] that in 1968 Charles filed a divorce action in this county, which action was pending on December 1, 1970, when Charles suffered an automobile accident, rendering him incompetent; that the 1968 divorce action was thereafter dismissed since "he was unable to conclude the divorce" due to his incompetency; and that Charles and Essie have since lived apart without cohabitation for over the statutory period of two years.[2]

Defendant cross-claimed for alimony on January 26, 1981. However, she voluntarily dismissed this cross-claim prior to trial, on May 4, 1981. Defendant also moved for summary judgment, on the grounds that her husband had not expressed the intent necessary to sue for divorce, which motion was overruled.

The court awarded Charles the divorce as prayed for, upon a finding that the parties had been living apart "for more than two years, to-wit, from 1971 to (the present)." No division of property was made pursuant to the divorce decree.

It is undisputed that the parties, Charles and Essie Edwards, have lived

---

[1] Charles has a son, Charles Gary Edwards, by a previous marriage.

[2] The complaint sought a divorce and "such other relief as may be just," but made no reference to alimony.

apart without cohabitation since 1971, when Charles was released from the hospital to the care of his sister (who since 1976 has also been his guardian), Annie Boyd.

The evidence at trial showed that Charles and Essie Edwards were married on March 7, 1966, in Columbus, Ohio, while Charles was in the Air Force; and that upon Charles' return, they lived together until March 29, 1966, at which time Charles was sent to Vietnam. They lived together at Otis Air Force Base in Massachusetts, from about May to November 1967, when Charles was sent overseas again. Essie testified that her husband had undergone a "personality change" as a result of his tour in Vietnam. In June 1968, Charles filed for divorce, alleging "extreme cruelty" as the ground. Essie cross-petitioned "for alimony and other relief."

On December 1, 1970, while the divorce action was still pending, Charles, on leave from an Air Force base in Topeka, Kansas, had an automobile accident in Columbus, Ohio (where he had gone to visit his wife, who resided there), as a result of which he had cardiac arrest and suffered brain damage from loss of oxygen.

Essie dismissed her petition voluntarily in 1971, and Charles' complaint was dismissed at plaintiff's (his) request in November 1972, according to court records.

Charles was hospitalized from the time of his accident until October 1971, at which time his sister, Annie Boyd, "decided" to take him home from the Dayton hospital where he was then confined to her residence in Cleveland,[3] where Charles has resided ever since.

In February or March 1971, three Air Force psychiatrists determined that Charles was mentally incompetent. In 1972, John Kellogg, attorney for Essie, was appointed Charles' guardian, and George Lowy, attorney for Annie, was made Charles' attorney. This arrangement continued until Kellogg resigned in 1976. After initial objection by Essie to Annie's request to be appointed successor guardian, an agreement signed by Essie and Annie was formalized through the probate court, whereby Essie withdrew her objection to Annie's appointment as guardian in exchange for visitation privileges with her husband.[4]

On March 12, 1976, Annie Boyd was appointed successor guardian of the person and estate of Charles, "who was found to be incompetent by reason of mental disability."

Charles (age fifty-seven at the time of trial) made no appearance at trial, nor was any expert testimony as to his current mental condition presented. When asked about Charles' present condition, his guardian, Annie, stated:

"He has improved from the time he came home but he still can't dress himself, he can't take baths. You'd have to take him to the bathroom. You sit him down and then some days he eats very well. Some days you have to feed him if you want him to eat.

"He can walk. If I take him to the shopping center or some place else, I take the wheelchair."

Further, she testified that Charles can talk, express feelings, watch televi-

---

[3] Essie has sought to argue that her sister-in-law "stole Charles away" by going to Dayton and intervening with the authorities to have him released to her (Annie Boyd's) custody.

[4] Since the signing of the agreement awarding visitation privileges, Essie made only one visit to Charles — in January 1981, during the pendency of this present lawsuit. Essie testified that she and Charles had "sexual contact" at this time, but on further questioning she explained that this contact consisted of "fondling."

sion, "read some things" and "write a little." Her son, Woodrow Boyd (an adult who shares his home with his mother and uncle), stated, "He [Charles] talks — sometimes he talks real good and sometimes he doesn't."

As a disabled veteran, Charles receives benefits from the Veterans' Administration — currently $1300 per month. Annie administers the funds on his behalf, and keeps his savings in a special account, which has a current balance of $40,000.[5] Initially, Essie received $200 per month from Charles' first guardian (Kellogg) as her "spouse's benefit"; but since Annie's appointment as guardian in 1976, these payments have ceased.

Essie Edwards is employed by the Ohio Department of Health, earning $17,700 a year. The title to the home where she resides in Columbus is in her name as "trustee," having been purchased with a downpayment of $10,000 made by her adult nephew and niece, who now live in New York City.

On direct examination, Essie Edwards testified first as to the history of her marriage with Charles prior to his accident. She stated that following Charles' filing for divorce in 1968, she and her husband were reconciled, and that they had sexual relations in July 1970, when he was home on leave from the base in Kansas, and again on the evening before the accident.

In January 1981, Essie visited Charles at Annie's home in Cleveland, at which time she said that Charles expressed a desire to go with her to her home in Columbus.

At the close of trial, defendant moved for a dismissal and also requested the court "not to order any division of property."

From the judgment awarding Charles a divorce as prayed for through his guardian, defendant-appellant Essie A. Edwards now takes this appeal, citing five assignments of error.

We begin with the first two related assignments:

"I. The court erred in imposing a divorce upon the husband through his guardian in the absence of the husband's testimony that he wanted a divorce.

"II. The court erred in imposing a divorce upon the husband based on the guardian's testimony in the absence of medical evidence that the husband was unable to testify."

Throughout these proceedings, appellant has consistently maintained that it was error for the court to proceed to grant the divorce upon the petition of Charles' guardian without ascertaining Charles' capacity to express his own wishes or intentions in this regard. The trial court, however, took the position that it had no discretion but to grant the divorce, provided that the statutory requisites were satisfied. Indeed, the court thwarted any attempt by appellant to introduce evidence that her husband did not in fact want the divorce his guardian was seeking.

Appellee argues that the trial court correctly determined that since this divorce was sought under Ohio's "no fault" divorce law, R.C. 3105.01(K)[6] (first enacted in 1974), the wishes of the incompetent spouse as plaintiff, even if

---

[5] All these funds were accrued since 1971, according to Annie.

[6] R.C. 3105.01, Grounds for divorce:

"The court of common pleas may grant divorces for the following causes:

"* * *

"(K) On the application of either party, when husband and wife have, without interruption for two years, lived separate and apart without cohabitation, and four years in the case in which one of the parties is continually confined to a mental institution. A plea of res judicata or of recrimination with respect to any provision of this section does not bar either party from obtaining a divorce on this ground."

these can be ascertained, are irrelevant as long as the guardian (on the incompetent's behalf) can prove that two or more years of physical separation between the parties without cohabitation has occurred. We disagree.

Under Ohio law, a "guardian" means "* * * any person, association, or corporation appointed by the probate court to have the care and management of the person, the estate, or both of an incompetent or minor * * *." R.C. 2111.01(A). The statute broadly defines "incompetent" as:

"* * * any person who by reason of advanced age, improvidence, or mental or physical disability or infirmity, chronic alcoholism, mental retardation, or mental illness, is incapable of taking care of himself or his property or fails to provide for his family or other persons for whom he is charged by law to provide, or any person confined to a penal institution within this state." R.C. 2111.01(D).[7]

One of the fiduciary duties of a guardian of the estate as prescribed by statute is, "To bring suit for his ward when such suit is for the best interest of such ward." (R.C. 2111.14[E].)

Pursuant to Civ. R. 17(B), a guardian is entitled to bring suit on behalf of his incompetent ward. The Rule (adopted in 1970) makes clear that where a guardian brings such suit, he is not himself the "party" but is acting in the "name" of "the real party in interest" (here, the incompetent):

"Parties plaintiff and defendant; capacity

"(A) Real party in interest. Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his name as such representative without joining with him the party for whose benefit the action is brought. When a statute of this state so provides, an action for the use or benefit of another shall be brought in the name of this state. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest. Such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

"(B) Minors or incompetent persons. When a minor or incompetent person has a representative, such as a guardian or other like fiduciary, the representative may sue or defend on behalf of the minor or incompetent person. * * *"

Civ. R. 25(B) also provides for the substitution of a guardian to continue an action filed by or against a person "adjudged incompetent."[8]

In the instant case, appellant challenges not the right of the guardian to bring suit on behalf of an incompetent, but the right of the court to proceed with the suit without either the party Charles' own testimony as to his wishes or else a showing by means of medical testimony that Charles was "unavailable" as a witness (presumably by evidence of his mental or physical incapacity to testify).

Appellee, on the other hand, relies, as did the court below, upon our interpretation of R.C. 3105.01(K) in *Cassaro* v. *Cassaro* (1976), 50 Ohio App. 2d 368 [4

---

[7] In the instant case, Annie Boyd was made guardian of both the person and the estate of Charles, by reason of his mental incompetency.

[8] "Substitution of Parties

"* * *

"(B) Incompetency.

"If a party is adjudged incompetent, the court upon motion served as provided in subdivision (A) of this rule shall allow the action to be continued by or against his representative."

O.O.3d 320], as to the policy reasons underlying "no fault" divorce, to wit:

"We conclude the intent of the Ohio General Assembly to be the same as that of the New York state legislature in the enactment of its 'no fault' divorce provision. The policy behind the New York statute was stated by Chief Justice Fuld of the New York State Court of Appeals in *Gleason* v. *Gleason* (1970), 26 N.Y. 2d 28, 35; 308 N.Y.S. 2d 347, 351:

" '* * * The real purpose of this nonfault provision was * * * to sanction divorce on grounds unrelated to misconduct * * *. *Implicit in the statutory scheme is the legislative recognition that it is socially and morally undesirable to compel couples to a dead marriage to retain an illusory and deceptive status and that the best interests not only of the parties but of society itself will be furthered by enabling them "to extricate themselves from a perpetual state of marital limbo."* ' " (Emphasis added.) *Cassaro* at 371.

We have no argument with the proposition that it is wrong to compel a party against his will to remain married once he complies with the no-fault provision in the statute. But we hasten to add that it is equally wrong to compel a divorce under no-fault, when neither party desires divorce. Traditionally the right to seek a divorce is considered a "strictly personal" right, insofar as "marriage is a personal and human relationship as well as an institution." See *Prather* v. *Prather* (C.P. 1934), 33 Ohio Law Abs. 336 (holding that a guardian cannot sue for divorce on behalf of a mentally incompetent person [who has had no interval of lucidity], since the will of such a person cannot be known, and he or she may wish to "condone the acts" which form the basis for the suit).

As to the personal nature of the right to divorce, the court held in *Van DeRyt* v. *Van DeRyt* (1966), 6 Ohio St. 2d 31, at 40, 41 [35 O.O.2d 42]:

"The court had a duty to assure itself that appellant *in fact* wanted a divorce, for the public policy of Ohio and its sister states favors the preservation of the marriage bond, 17 Ohio Jurisprudence 2d, Divorce and Separation, Section 3; 17 American Jurisprudence, Divorce and Separation, Section 12; 27A Corpus Juris Secundum, Divorce, Section 8b. Thus the divorce laws are strictly construed against the granting of divorces. * * *

"* * *

"Divorce is always at the option of the petitioner. It can never be imposed, even if the petitioner is clearly entitled to a divorce, for the law encourages the condoning of marital infidelities." (Citations omitted.)

We note that this view of divorce provides the underlying rationale for cases in Ohio which have held that a guardian cannot bring a divorce action on behalf of an incompetent whose unremitting mental incapacity precludes him from testifying. See *Prather, supra,* and *Jack* v. *Jack* (App. 1947), 49 Ohio Law Abs. 207.[9]

In *Shenk* v. *Shenk* (1954), 100 Ohio App. 32 [59 O.O. 471] (in language obviously derived from a reading of the older *Prather* case), the court stated:

---

[9] See, also, *Scott* v. *Scott* (Fla. 1950), 45 So. 2d 878 (guardian could not bring a divorce suit since a legally insane person as the injured spouse could not give the requisite intent to dissolve the union); *Sternberg* v. *Sternberg* (1948), 203 Ga. 298, 46 S.E. 2d 349 (guardian could not sue on behalf of incompetent wife whose mental condition was alleged to be permanent and incurable); and other citations in 6 A.L.R. 3d 681, Section 3(b).

On the other hand, in a few jurisdictions, suits by a guardian have been permitted even without testimony as to the incompetent's wishes, including *McRae* v. *McRae* (1964), 43 Misc. 2d 252, 250 N.Y.Supp. 2d 778 (action by a guardian ad litem on behalf of incompetent husband against wife on the ground of adultery allowed "in the interests of justice").

"At the outset, it must be kept in mind that marriage is a civil contract, a personal and human relationship, as well as an institution. It cannot be created except by the consent of the parties. It cannot be dissolved except by the consent and the intelligent exercise of the will of one of the parties. *That is to say, that no matter what or how many valid grounds for divorce exist, it is only by the decision and will of the party aggrieved that an action for divorce may be brought.* Such aggrieved party may desire to condone acts that may have been committed by the opposite party. Such party may, for personal reasons, whether social, financial or religious, or out of consideration for the welfare of children or even other members of the families involved, desire that the marriage relation continue. There are no marital offenses which cannot be condoned. It is not the marital offense in itself that works the dissolution of the marriage union. It is the will and volition of the party aggrieved that invokes the judicial process to review the wrong and grant the relief which such will and volition of the aggrieved party has decided to request." (Emphasis added.) *Id.* at 33-34.

*Shenk* involved a plaintiff-wife who was awarded a divorce, notwithstanding her husband's allegations that she was mentally incompetent. The appellate court reversed the trial court, holding that the trial court erred (1) in refusing to admit evidence as to plaintiff's insanity; and (2) in failing to make an initial determination as to plaintiff's sanity before proceeding.

In the instant case, there is evidence that the husband Charles, on whose behalf the divorce was sought by his guardian, can talk, express feelings, and even read and write. Yet Charles made no courtroom appearance, and the trial court before proceeding made no attempt to determine if Charles could be a competent witness to testify on his own behalf, or otherwise to ascertain Charles' personal

intentions and desires regarding the dissolution of his own marriage.

The competency of a party or a witness to testify is governed by Evid. R. 601:

"General Rule of Competency

"Every person is competent to be a witness except:

"(a) Those of unsound mind, and children under ten (10) years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly * * *."

Regarding "persons of unsound mind," the Rule is a verbatim restatement of the prior statute, R.C. 2317.01. In *State* v. *Wildman* (1945), 145 Ohio St. 379 [31 O.O. 5], the court set forth the following "governing principle":

"A person who is able to correctly state matters which have come within his perception, with respect to the issues involved, and [who] appreciates and understands the nature and obligation of an oath is a competent witness, notwithstanding some unsoundness of mind. Annotation, 148 A.L.R., 1140. * * * In 2 Wigmore on Evidence (3 Ed.) 590, Section 497(c), appears the following text, which is supported by many authorities cited in the notes:

" 'The preliminary determination of capacity is *for the judge,* not the jury * * *; and it is therefore an improper practice for the judge to leave the testimony provisionally to the jury, to be rejected by them if found ineligible according to legal standard; the jury have nothing to do with preliminary questions of admissibility. But, after the court has passed on the witness' capacity it is still open to the jury to conclude that the witness is not credible and to reject the testimony entirely; and the court's decision does not necessarily affect the estimate which the jury must make.' " *Wildman* at 386-387.[10]

---

[10] The syllabus in *Wildman* reads:

"2. The competency of an insane person

See, also, *Kornreich* v. *Industrial Fire Ins. Co.* (1936), 132 Ohio St. 78 [7 O.O. 198], and *Smith* v. *Barrick* (1949), 151 Ohio St. 201 [39 O.O. 31] (competency of a proposed witness is within the court's discretion to determine). Thus, Ohio courts have held that a witness previously adjudged insane or placed in a mental institution, may nonetheless have been sufficiently restored to sanity to be permitted to testify, in the interests of justice. See *State v. Webb* (App. 1955), 72 Ohio Law Abs. 306, and *State v. Braden* (1936), 56 Ohio App. 19 [9 O.O. 200].

In the context of marriage, an adjudication of incompetency prior to marriage is not necessarily conclusive proof of the person's incapacity to enter a valid marriage. According to *Seabold* v. *Seabold* (1948), 84 Ohio App. 83 [39 O.O. 112], a mentally ill person who has an appointed guardian can still enter into a valid marriage, provided he or she "fully comprehends the nature and consequences of his or her act in getting married." *Id.* at 88.[11]

This court addressed the issue of an incompetent's ability to marry in *Dozer* v. *Dozer* (App. 1930), 8 Ohio Law Abs. 507, where we said:

"While it is true that [the wife] Electa King Dozer was at the time of the marriage under a guardianship yet from the testimony and from the evidence she gave it is evident that she fully understood what she was doing and had sufficient mental capacity to enter into the marriage relation. The mere fact that she was under a guardianship would not render the marriage contract void. The degree of mental capacity required to enter into a valid marriage is laid down in 18 R.C.L. as follows:

" 'Therefore, it is not every unsoundness of mind that will make void a marriage contract, and *if a person entering into the marriage relation has sufficient capacity to understand the nature of the contract and the duties and responsibilities which it creates the marriage will be valid.*' " (Emphasis added.) *Id.* at 507.

Similarly, a testator who has been adjudicated incompetent but has intervals of lucidity may still be capable of making a valid will. Such an adjudication merely operates as a rebuttable presumption of incapacity which may be opposed and overcome by sufficient evidence to the contrary. *Kennedy* v. *Walcutt* (1928), 118 Ohio St. 442; *Hermann* v. *Crossen* (App. 1959), 81 Ohio Law Abs. 322.

Thus, it follows that the court, when presented with a petition for divorce on behalf of a party adjudged incompetent because of certain limitations both physical and mental, nevertheless, has a duty to ascertain from the party himself, if possible, whether it is his sincere wish and desire to divorce his spouse before proceeding further, especially where there is testimony from the party's guardian that he has the capacity to communicate and express his feelings.

Although we could find no Ohio case on point, we note with approval the case of *In re Marriage of Higgason* (1973), 10 Cal. 3d 476, 110 Cal. Rptr. 897, 516 P. 2d

---

to testify as a witness lies in the discretion of the trial judge and a reviewing court will not disturb the ruling thereon where there is no abuse of discretion.

"3. A person, who is able to correctly state matters which have come within his perception with respect to the issues involved and appreciates and understands the nature and obligation of an oath, is a competent witness notwithstanding some unsoundness of mind."

[11] See, also, *Johnson* v. *Johnson* (N.D. 1960), 104 N.W. 2d 8, holding that " 'the best accepted test as to whether there is a mental capacity sufficient to contract a valid marriage, is whether there is a capacity to understand the nature of the contract and the duties and responsibilities which it creates,' " *id.* at 14, and Annotation, 82 A.L.R. 2d 1040, Section 3.

289, where a guardian ad litem brought a divorce action on behalf of a wife, and the Supreme Court of California held that the guardian was the representative, not the party to the action, and that the trial court properly found that the wife, although adjudged incompetent, was in fact not insane, but was capable of exercising judgment and had clearly expressed her desire that the marriage be dissolved.[12] See, also, *Spooner* v. *Spooner* (1918), 148 Ga. 612, 97 S.E. 670 (plaintiff-wife, although weak in mind had sufficient capacity to maintain a divorce action); *Akin* v. *Akin* (1926), 163 Ga. 18, 135 S.E. 402 (trial judge found that plaintiff, on furlough from a mental institution, had sufficient capacity to sue for a divorce on her own behalf); *Stevens* v. *Stevens* (1934), 266 Mich. 446, 254 N.W. 162 (wife substituted as plaintiff in a suit originally brought by her guardian, where the court was satisfied that she had the mental capacity to understand the nature of the divorce proceedings); and *Turner* v. *Bell* (Tenn. 1955), 279 S.W. 2d 71 (upholding a divorce awarded by the trial court to a plaintiff-wife previously adjudged incompetent upon a finding that she had the requisite volition to seek a divorce and the capacity to testify and maintain the action).[13]

We find unpersuasive appellee's argument that the intention or volition of the spouse is irrelevant in a divorce action brought under the "no fault" divorce provision, R.C. 3105.01(K). In the case at bar, notwithstanding uncontroverted evidence that the parties have lived apart without cohabitation for over ten years (since 1971), there still may be reasons why the parties have been unable to live together which would warrant continuing the marriage.

Not every physical separation is automatically grounds for dissolving a marriage. There may be special circumstances — outside one or both of the parties' control, for that matter — which explain why the parties have been living apart, and which do not warrant the conclusion that the marriage should be dissolved.[14] This is particularly true where, as in the instant case, the defendant wife has opposed the divorce and has attempted to show that the physical separation has been coerced or imposed rather than voluntarily maintained, and where appellee-guardian has presented no evidence as to the current wishes of the husband, the other party to the marriage, on whose behalf the guardian has made "application" under the statute. From the record below, we cannot determine whether the husband has even been informed about the action taken on his behalf by his sister and guardian, much less whether he has the capacity and desire to render such a decision.

We therefore conclude, absent a determination of the husband's wishes insofar as these can be elicited (or at the least a determination by the court of the husband's incapacity to express any wishes regarding this dissolution) that the court erred in proceeding to grant the divorce over the continuing objections of defendant-appellant, and in light of testimony that her husband "wanted to come home" and that she had continued to maintain a home available to him. Our holding in *Cassaro, supra,* is consistent with our holding in the case *sub judice,* in that unless the court can determine whether the physical separation has been

---

[12] In *Higgason*, since the wife was physically unable to attend the hearing, a deposition of her testimony was presented. In the instant case, Charles is ambulatory — sometimes with the aid of a wheelchair — and has appeared at a court proceeding on at least one other occasion.

[13] See, also, 19 A.L.R. 2d 144, Section 20, Plaintiff's Insanity as Affecting Right to Divorce.

[14] A current example would have been the "hostages" held in Iran, if their internment had lasted two years.

"compelled" or imposed upon the parties, it is impossible for the court to decide whether the dissolution is in fact in "the best interests of the parties." We note further that the statutory scheme of R.C. 3105.01(K) requires the court to exercise some discretion in determining whether a requested divorce should be awarded, and that consequently the granting of a divorce under this section does not automatically follow in every case upon proof of physical separation for two years or more and the absence of cohabitation.

In summary, it is our judgment that the trial court erred in not making a prior determination as to whether the husband Charles was sufficiently competent to speak on his own behalf; and, if so, in making no inquiry into his personal wishes regarding this divorce action brought by his guardian as his representative.

Appellant's Assignments of Error I and II are hereby sustained.

"III. The court erred in permitting the guardian to testify to communications with the husband but in refusing to permit the wife in testifying to communications with the husband and of her efforts to regain control of her marriage and efforts to stop the separation."[b]

On direct examination, appellant Essie Edwards was prevented from testifying as to certain matters pertaining to whether or not (as Essie has sought to argue) the separation of the parties was enforced or coerced by circumstances outside the control of either.

In view of our disposition of the first two assignments of error, the trial court erred in not arranging for an inquiry into Charles' mental state with regard to this divorce proceeding. To the extent that this assignment restates the issues already disposed of in Assignments of Error I and II above, it is well taken. Of course, had the trial court directly inquired into Charles' mental condition, there would have been no reason for appellant to attempt to bring in evidence of his unwillingness for divorce through her own testimony.

"IV. The court erred in refusing to dismiss the divorce when the plaintiff appeared in court and rested with no corroborative witness, yet the court stepped in and acted as an advocate for the plaintiff even to the extent of demanding of plaintiff's counsel, 'Do you have an objection?' "

Appellant claims that the court improperly acted as advocate for appellee below in not permitting the guardian to rest her case on the strength of her testimony alone without calling for a corroborative witness, as required in a divorce proceeding under Civ. R. 75(L).

The record below discloses that initially appellee sought to put the wife Essie Edwards on the stand — but that Essie was not present in court at that time and had not been subpoenaed — before proceeding with the guardian's testimony, and further that appellee had not formally rested her case when the court recessed proceedings until the following morning, at which time appellee presented the corroborative testimony of several witnesses, including Essie. We find no error in this proceeding.

In the absence of an affirmative showing of prejudicial error below, this court will presume regularity in the proceedings. *Ostrander* v. *Parker-Fallis* (1972), 29 Ohio St. 2d 72 [58 O.O.2d 117].

Assignment of Error No. IV is hereby overruled.

"V. The court erred in failing to divide the marital assets evenly or fairly, giving 100% of the assets to the guardian."

This assignment is a misstatement of the trial court's determination that there would be no redistribution or division of property between the parties pursuant to the divorce. Moreover, appellee's complaint did not specifically request either alimony or a division of property, and appellant, after an initial filing of a counterclaim for alimony, voluntarily dis-

missed her counterclaim prior to the hearing.

Finally, appellant's counsel in open court at the close of the hearing requested the court *not* to order any division of property.

A party has waived the right to assign on appeal any error which he or she could have, but did not, bring to the attention of the court below. *Shibley* v. *Time, Inc.* (1975), 45 Ohio App. 2d 69, at 75 [74 O.O.2d 101]. Here, appellant herself asked the court to refrain from making any division of property. She therefore cannot be heard in this appeal to complain on her own request that the court granted.

Assignment of Error No. V is hereby overruled.

We reverse and remand to the court of common pleas for further proceedings consistent with this opinion.

*Judgment reversed and*
*cause remanded.*

DAY and MARKUS, JJ., concur.