JOURNAL ENTRY AND OPINION
Thomas Gulla, Jr. was four years old when he was taken from his parents' home into emergency custody on August 20, 1996. This was later converted into temporary custody. The Cuyahoga County Department of Children and Family Services (county) filed a complaint seeking permanent custody on May 6, 1998. Following three hearings, the trial court awarded permanent custody to the county.
Appellant-parents separately appeal this award, although the same attorney represented the parents jointly at the trial level. Their appeals were consolidated by this court.
Thomas Gulla, Jr. (the child) is biracial in appearance. His mother Sharon Wiley (the mother) is Caucasian, as is the purported father, Thomas Gulla, Sr. (the father). Father signed papers with the county to establish paternity in 1996 although biological testing showed that he is not the biological father. All parties agree that he is the legal father of the child. Father refuses to accept that he is not the biological father of the child, or that the child is biracial. Father says that he looks Puerto Rican or Sicilian. Mother has a history of paranoid schizophrenia and told several county employees that she is a secret agent who goes on frequent missions to Washington. Mother also called the county in 1992, when she was pregnant with this child, and claimed that the father of the child was a black F.B.I. agent named Willie Washington, who would harm her and the child. The county most recently became involved with this family when a neighbor reported that mother struck the child with the back of her hand in public. When the county investigated the home, the child was naked and drinking from a baby bottle, although he was four years old. The apartment was empty except for one mattress on the floor. The social worker testified that mother, father and child all slept together on this mattress. Tr. 1 at 43. The child was taken into custody at that time.
Parents were given a case plan to follow in an attempt to reunite the child with them. They also visited with the child for two hours every other week. The case plan included attending parenting classes, DNA testing to establish paternity, and psychiatric counseling for both the parents.[1]
The parents went through separate parenting classes and attended all of them. They did not benefit from the classes, however. The coordinator of the parenting classes father attended testified that he told her he was there just because he had to be there to fulfill his case plan, that he didn't learn anything, that he already knew everything that they were going to teach him. Tr. 1 at 13.[2] Father testified that because he attended parenting classes at WIC, he already knew more than the instructors at the county required parenting classes. I gave them new ideas that I learned from the other parenting class * * *. Tr. 2 at 40. Father felt that the only thing he learned from the county parenting class was Don't drink. Tr. 2 at 88.
Mother completed parenting classes later, although she told the coordinator of the program that she felt that she did not need the class because she reads psychology books and she has her own way of parenting and that was the way she was going to continue to parent. Tr. 1 at 95. The coordinator of the program also testified that mother often sat in class with her back to the teacher, refused to participate in the discussion, or would participate inappropriately: she would talk about something completely different that didn't have anything to do with parenting. Tr. 1 at 106-107. The coordinator concluded by testifying that she did not feel that mother had benefitted from the program. The coordinator stated that she did not know if there are any agencies available to give that type of support for the length of time she would need them. Tr. 1 at 110.
The case plan also required father to establish paternity through DNA testing. The testing proved that he was not the biological father of the child, but he refused to believe this, and he continued to insist that the child was his. The county expressed concern that the child would have difficulty dealing with his biracial identity in light of his parents' denial of it. The county was also concerned because, as one social worker testified, father did make some derogatory comments to me as far as he did not like black people, he did not want his son to be around black people * * * he was just derogatory about black people * * *. Tr. 1 at 118.
In her report, the psychologist Dr. Huntsman said that even after the DNA test results, Mr. Gulla indicated that his son had blue eyes and blonde hair. Then, he showed me a picture of a clearly biracial child. At other times, he told people that the child was tan from the summer. He also testified that the child was not as dark as he appeared in his picture; if you want to use a cheap camera, skin becomes darker, he explained. Tr. 2 at 71. Despite clear evidence to the contrary, father remains deluded regarding the child's paternity.
The third element of the case plan required that both parents seek psychological counseling and the mother take psychotropic medications. Both parents denied that the mother had any psychologicalor emotional problems. Father stated that mother is not paranoid, she's got brain injury. Tr. 2 at 97. He went on to say, [s]he may have a slight case of retardation but she's as normal as she can be. Tr. 2 at 97-98. He stated that her hallucinations were just stories that she made up.
Mother did not testify. She was described by all the county professionalsas disturbed, hallucinating, and schizophrenic. Dr. Huntsman stated in her testimony that mother was schizophrenic, paranoid type * * *. Because of the quality of her delusions, she does not see herself as having any problem. * * * She's not been willing to seek treatment or be involved in treatment, * * * so I think it's doubtful that she would be willing to participate in treatment. Tr. 1 at 185.
Mother refused to take medication or seek counseling. One of the social workers explained what mother told her: Ms. Wiley does not believe in taking medication, prescribed medications. Tr. 1 at 79-80. Even mother's guardian ad litem stated in her closing argument, I do not believe it would be in [mother's] best interest that the child be placed solely in her care and custody. Tr. 3 at 59.
Only the father testified to support the parents' retaining custody.
The first two assignments of error pertain only to the father's custody battle. Because they are related, we will address them together.
 I. THE APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DUE TO A CONFLICT OF INTEREST.
 II. THE TRIAL COURT ERRED IN ALLOWING THE PARENTS IN A PERMANENT CUSTODY HEARING TO BE REPRESENTED BY THE SAME COUNSEL.
Father argues that because his attorney represented the parents as a couple, their attorney could not effectively represent father's independent interest. Father alleges that his attorney should have advised him to live apart from the mother so that he would have had a chance to establish a stable environment for his son without the negative presence of the mother. Father analogizes the attorney's representation of both parents to that of a criminal defense attorney whose representation of two defendants compromise the defense of one defendant but helps another. Father claims his interest was similarly compromised when the court appointed only one attorney to represent both parents.
Because appellant failed to raise this objection at the trial court, he therefore has waived his right to raise it here. A party has waived the right to assign on appeal any error which he or she could have, but did not, bring to the attention of the court below. Boyd v. Edwards (1982),4 Ohio App.3d 142, 151.
However, even if he had raised this issue in the trial hearings, it would have been harmless error if it were error at all. Father argued that independent counsel could have advised him to live apart from the mother and establish a home for the child. The case plan already stated, however, that the parents should live apart to determine whether the father could establish a home for the child. Tr. 1 at 40, 160-61. The mother did live on her own for four months, but she then moved back in with the father. Father should not have needed the added advice of counsel to follow the case plan. Therefore, the court did not err in not appointing separate counsel for each parent.
The third assignment of error states
 CCDCFS [COUNTY] DID NOT PROVE ITS CASE BY CLEAR AND CONVINCING EVIDENCE.
The court's journal entry states its reason for granting permanent custody to the county: the parent(s) has failed continuously and repeatedly for a period of six (6) months or more to substantially remedy the conditions causing the child to be placed outside the home.
Custody of a child is governed by R.C. 2151.414(E):
 In determining at a hearing * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with his parents, the court shall consider all the relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents:
 (1) Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantiallyremedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties. [Emphasis added.]
The court may award permanent custody to the county if one or more of the conditions enumerated in R.C. 2151.414(E) exists.
In the case at bar, the evidence showed that both parents failed to obtain the psychiatric/psychological services required in the case plan. Neither parent saw any need to use these services, and both were completely resistant to any counseling or change. Similarly, both parents failed to benefit from the parenting classes offered by the county. They both went into the classes convinced that they knew more and better than the instructors, and both were entrenched in their belief that their own child rearing methods were superior to anything the classes could teach them.
In sum, both parents failed to use the resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties. Moreover, because they did not believe that there was any need for them to change, neither parent put any effort into the parenting classes other than showing up. Nor did either parent put any effort into counseling. Their total lack of cooperation, coupled with their total lack of acknowledgment of the problems which led to temporary placement of the child, precludes the court from denying the county permanent custody. The court must act in the best interest of the child.
The factors for determining what is in the best interest of a child are listed in R.C. 2151.414(D):
 In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The reasonable probability of the child being adopted, whether an adoptive placement would positively benefit the child, and whether a grant of permanent custody would facilitate adoption;
 (2) The interaction and interrelationship of the child with his parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (3) The wishes of the child, as expressed directly by the child or through his guardian ad litem, with due regard to the maturity of the child;
(4) The custodial history of the child;
 (5) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
The child in the case at bar has a strong chance of being adopted according to the county officials. The first factor therefore favors county custody.
The second factor to be considered is the child's interactions with his family and friends, as well as with his foster family. While he is fond of his parents, this child is not unhappy when his visits with them end and he leaves. Indeed, he calls his foster parents Mom and Dad. No one disputes that the parents love this child and want what is best for him. Unfortunately, they are not able to recognize what is good for the child.
The child has no siblings in the home and, according to the social worker, no playmates. The child's guardian ad litem stated in his report for the court that he believed that it is in the best interest of Thomas Gulla, Jr. for the county to take permanent custody of him. He has been in the care of CCDCFS for two years. While he does have a relationship with the parents, he needs permanency. I do not believe that either of the parents are appropriate. * * * [The child] has a good chance of being adopted by parents who can meet his needs. The evidence, therefore, clearly shows that the child is better off away from his parents and with a foster family.
The third factor to consider is what the child wishes. The child at the time of the hearings, however, was seven years old, and nothing in the record indicates what his wishes are.
The final two factors are the custodial history of the child and whether he can be placed in a permanent home. At this time, the child has been in county custody for half of his life. His guardian ad litem stated he has a good chance of being adopted.
The last two factors weigh in favor of granting permanent custody for the county.
The county showed by clear and convincing evidence that placing the child in permanent custody of the county is in his best interest because the parents failed to substantially remedy the conditions which caused him to be placed outside the home.
It is ordered that appellee recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Juvenile Court Division of the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 __________________________________ DIANE KARPINSKI, PRESIDING JUDGE
ANNE L. KILBANE, J., and JAMES M. PORTER, J., CONCUR.
[1] The initial case plan also called for an evaluation of the child's speech and hearing because of the way he spoke. This requirement of the case plan was removed once it was determined that the child's speech and hearing were fine and that he was merely copying the speech patterns of the father, who is hearing impaired.
[2] The hearing in this case was held on three separate days. The hearing for February 8, 1999 is referred to as Tr. 1; the hearing for April 14, 1999 is referred to as Tr. 2; the hearing for June 28, 1999 is referred to as Tr. 3.